# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                          No. CR 10-1919 JB

SEAN JOSEPH PETERSON,

      Defendant.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on Defendant's Sealed Objections to the Presentence Report and Motion for Downward Departure, filed Mar. 30, 2012 (Doc. 138)("Objections to PSR"); and (ii) the Defendant's Sentencing Memorandum and Request for Downward Variance, filed Mar. 30, 2012 (Doc. 139)("Sentencing Memo."). The Court held a sentencing hearing on April 26, 2012. The primary issues are: (i) whether Defendant Sean Joseph Peterson is entitled to a role adjustment under U.S.S.G. § 3B1.2 for having a mitigated role in the offense; (ii) whether the Court should depart downward based on S. Peterson's fatherless childhood, his military service, and/or because the career offender enhancement over-represents his criminal history and likelihood of recidivism; and (iii) whether the Court should grant S. Peterson's request for a variance based on S. Peterson's military service, lack of youthful guidance, and rehabilitative efforts. The Court finds that S. Peterson is not entitled to a role adjustment, and the Court will not

---

[1] In its Sealed Memorandum Opinion and Order, filed Dec. 18, 2012 (Doc. 161)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO. See Sealed MOO at 1 n.1. The Court gave the parties fourteen calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

grant his request for a downward departure.  On the other hand, the Court believes that the career offender enhancement over-represents S. Peterson's criminal history, and that he has displayed good character and a strong likelihood of rehabilitation, and on the basis of those factors, the Court will grant S. Peterson's request for a variance.  The Court sentences S. Peterson to the custody of the Bureau of Prisons for 110 months.

## FACTUAL BACKGROUND

S. Peterson has not always been fortune's friend, but he has shown an ability to overcome the hurdles life presented.  He grew up without knowing his father, but completed high school, received commendations during his term of enlistment in the Marine Corps, and has been able to keep a job.  On the other hand, his history of selling and trafficking of drugs is a worrisome pattern in his adult life.

1.    **S. Peterson's Background and Characteristics.**

S. Peterson was born October 31, 1975, in Louisville, Kentucky.  S. Peterson's mother, Brenda Peterson, was seventeen years old when she gave birth to him, and S. Peterson grew up as an only child and without knowing his father.  See Presentence Report ¶ 46, at 14, disclosed Aug. 29, 2011 ("PSR");[2] Addendum to the Presentence Report at 1, dated Dec. 15, 2011 ("Addendum to PSR").  At the age of twelve S. Peterson saw his father for the first time during a court battle, before S. Peterson moved to Florida with his mother.  S. Peterson relates that his mother did the best she could with him, given her young age when S. Peterson was born.  S. Peterson grew up with his basic

_____

[2]The Court notes there are two discrepancies in the PSR.  On the first page, the PSR lists Billy R. Blackburn as an appointed counsel for S. Peterson, but later the USPO states that Blackburn is retained counsel.  Cf. PSR at 1, with PSR ¶ 67, at 18.  Regarding S. Peterson's date of arrest, the USPO first lists that Peterson was arrested on May 31, 2010, and that S. Peterson has been in "[c]ontinuous custody since the date of arrest."  PSR at 1.  The USPO later states that Peterson has "been in continuous custody since his arrest on June 2, 2011."  PSR ¶ 6, at 4.

needs being met.  See PSR ¶ 47, at 14.

S. Peterson has a good relationship with his mother, who is aware of his situation and remains supportive.  See id. ¶¶ 46, 49, at 14-15.  S. Peterson's mother is a teacher in Louisville.  She has hepatitis, but the disease is in remission.   See id. ¶ 46, at 14.  S. Peterson has never been married, although he reports a three-and-a-half-year relationship with his current girlfriend.  See id. ¶ 50, at 15.  The USPO could not reach S. Peterson's girlfriend to confirm the information S. Peterson provided.  See PSR ¶ 51, at 15.

S. Peterson completed high school in Louisville.  See id. ¶ 58, at 16.  He obtained a mortgage banking license from the state of Kentucky, and was approved as a loan originator by Kentucky in 2007.  See id. ¶ 59, at 16.  S. Peterson worked as an banker in Louisville from 2005 to 2006, making approximately $40,000.00 per year.   See id. ¶ 62. at 16.  His loan-originator license has since expired.  See id. ¶ 59, at 16.  Before his banking job, S. Peterson worked as a dealer/manager at a resort and casino in Indiana, where he made approximately $59,000.00 per year.  See PSR ¶ 63, at 17.  At the time of his arrest, S. Peterson was self-employed as a music vendor.[3]  See id. ¶ 61, at 16.

S. Peterson enlisted in the military from 1995 to 1996, and he obtained the rank of Lance Corporal.  He was medically discharged because of issues with his left eye.  See id. ¶ 64, at 17.  S. Peterson's eye socket was shattered when he was "jumped," at the age of seventeen.  Id. ¶ 52, at 15.  S. Peterson has no history of serious or chronic illness, and was not under a physician's care when arrested.  See id. ¶ 52, at 15.  S. Peterson reports that he regrets his current circumstances, but is not depressed.  He has no history of mental or emotional health problems, or treatment for such problems.  See PSR ¶ 53, at 15.

---

[3]The PSR does not elaborate as to what a "music vendor" is.  PSR ¶ 61, at 16.

S. Peterson believes that he has a substance abuse problem.  He first used alcohol at nineteen, and began drinking beer and hard liquor when in the United States Marine Corp.  He last used alcohol at the age of thirty-four.  S. Peterson reports that he would often drink three to four drinks a day of either liquor or beer.  See id.¶ 54, at 16.  S. Peterson began smoking marijuana at the age of sixteen and last used it at the age of thirty.  S. Peterson does not smoke marijuana often, as it causes him anxiety.  See id. ¶ 55, at 16.  S. Peterson starting using Percocet[4] in 2007 when he had his wisdom teeth pulled.  S. Peterson became addicted and was taking approximately two-and-a-half pills a day at the height of his addiction.  Beginning in 2007 and through 2009, he became addicted to Suboxone,[5] and was using approximately eight milligrams a day to stay "baseline."  Id. ¶ 56, at 16.  Percocet is S. Peterson's drug of choice.  See id. ¶ 56, at 16.  S. Peterson was ordered to complete a thirty-hour drug program for a previous Kentucky State conviction.  The USPO was not able to obtain any records for this program.  S. Peterson is interested in participating in the Bureau of Prisons 500-hour drug treatment program.  See PSR ¶ 57, at 16.  S. Peterson was responsive and cooperative during his presentence interview.  See id. ¶ 53, at 15

S. Peterson has three previous adult criminal convictions, all rendered at the state level.  The first criminal conviction he received was at the age of twenty-six, in 2002, in Louisville, for misdemeanor driving under the influence.  S. Peterson pled guilty to this charge, and was sentenced

---

[4]Percocet is tablet administered orally, which contains the drugs oxycodone hydrochloride and acetaminophen, and is used for the "relief of moderate to moderately severe pain."  Percocet, Physician's Desk Reference 1304 (Lori Murray et al. eds., 57th ed. 2003). "Psychic dependence, physical dependence and tolerance may develop upon repeated administration of PERCOCET." Id.

[5]Suboxone is a medication that is used to treat addiction to and dependence on narcotics, such as heroin, morphine, and methadone.   See Suboxone SL, Uses, WebMd, http://www.webmd.com/drugs/mono-8352-BUPRENORPHINE%2fNALOXONE+-+SUBLING UAL.aspx?drugid=64741&drugname=Suboxone+SL&source=0 (last visited Dec. 14, 2012).

to fines and fees.  See id. ¶ 37, at 10.  S. Peterson was convicted in Louisville at the age of twenty-seven for felony complicity to traffic more than five pounds of marijuana.  S. Peterson pled guilty on February 8, 2006, and was sentenced to nine years of custody, fines and fees.  His sentence was probated.  S. Peterson was given early release from his sentence, and successfully completed his sentence on February 22, 2009.  See id. ¶ 39, at 11.  S. Peterson was convicted in Burlington, Kentucky, at the age of twenty-nine, for felony cultivation of five or more marijuana plants, and misdemeanor possession of drug paraphernalia, in Burlington, Kentucky.  S. Peterson pled guilty to both charges on February 23, 2006, and was sentenced to three years of probated custody, fines, and fees, and twelve months of probation for the misdemeanor offense.  As of February 22, 2009, his probation term was successfully completed.  See id. ¶ 38, at 10-11.

**2.      Circumstances of Criminal Conduct.**

On April 26, 2010, the Air and Marine Operations Center ("AMOC")[6] detected an unidentified aircraft traveling across Arizona and into New Mexico.  The AMOC planned to dispatch an aircraft to intercept the unknown aircraft, but AMOC's tracking of the unknown aircraft was lost.  The unknown aircraft was later located over Grants, New Mexico, and then descending

---

[6]The AMOC is a branch of the Customs and Border Protections division of the Department of Homeland Security.  The AMOC

> is the nation's only federal law enforcement center tasked to coordinate interdiction operations in the Western Hemisphere. . . . [T]he AMOC was established in 1988 as a state-of-the-art law enforcement . . . center to counter the airborne drug smuggling threat. . . . [T]oday the AMOC provides detection, monitoring, sorting, tracking and coordination of law enforcement response to suspect airborne and maritime activity at, beyond and internal to our nation's borders.

Air and Marine Operations Center, CBP.gov, http://www.cbp.gov/xp/cgov/border_security/am/operations/locations/am_ops_center.xml (last visited Dec. 12, 2012).

into Santa Rosa, New Mexico, en route to the Route 66 Airport.   The AMOC notified the Santa

Rosa Police Department ("SRPD") of the unknown aircraft.  See PSR ¶ 9, at 5.

SRPD arrived at the airport and observed the unknown aircraft, as identified by AMOC,

parked there.  SRPD officers headed toward the vehicle, but a passenger, later identified as co-

Defendant Kevin Michael Nolf, saw the officers, appeared to inform S. Peterson of the SRPD

officers' approach, and Nolf and S. Peterson then engaged the aircraft and headed for the airstrip.

SRPD officers noted the tail number on the aircraft.  The aircraft evaded the SRPD officers and took

off, and appeared to be heading toward Tucumcari, New Mexico.  See Id. ¶ 10, at 4.

Later, Mr. Gerald Hight, a ranch owner in Tucumcari, observed a low-flying aircraft circling

his residence.  The aircraft appeared to be attempting a landing on New Mexico State Highway 209,

but finally landed in Hight's pasture.  Hight drove to the landing site with his son, and saw Nolf and

S. Peterson unloading duffle bags from the aircraft.  When Nolf and S. Peterson saw the Hights, they

began to put the duffle bags back into the aircraft.  The Defendants said they were uninjured, and

told Hight that they did not need to call 911 or the Federal Aviation Administration.  Hight offered

to take the Defendants to Tucumcari for lodging, and on the way there, Hight overhead one of the

Defendants state that they "were not going to make it to New Orleans tonight."  Id. ¶ 11, at 4-5.

Hight took the Defendants to the Holiday Inn in Tucumcari, but Hight then saw the Defendants leave

the Holiday Inn and enter the Microtel Inn Hotel.  See Id. at ¶ 11, 4-5.

Hight found the Defendants' behavior suspicious.  Hight reported the incident to the New

Mexico Sheriff's Department in Quay County.  When deputies arrived at the Microtel Inn, they

found S. Peterson, but not Nolf.  When questioned, S. Peterson stated that he did not know anything

about the landing.  See PSR ¶ 11, at 5.  The Sheriff's Department called the New Mexico Sate Police

("NMSP") regarding the aircraft landing, and NMSP officers arrived at the Microtel Inn to

investigate.  See Id. ¶ 12, at 5.  S. Peterson would not provide a statement without an attorney.  The NMSP officers read S. Peterson his Miranda[7] rights and transported him to the NMSP Office in Tucumcari.  The hotel staff informed the Sheriff's deputies that Nolf had left before the Sheriff's deputies arrived, and the staff provided the officers with a copy of Nolf's identification.  Officers could not locate Nolf.  Because the officers could not obtain a search warrant and were not able to classify the landing as a crash or emergency landing, S. Peterson was released on April 27, 2010.  See Id. ¶ 13, at 5.

Later on April 27, 2010, the NMSP officers obtained a search warrant and searched the aircraft, finding 377.5 pounds of marijuana inside large black duffle bags in the aircraft.  Two additional duffle bags were found in the vicinity, which, combined with the marijuana inside the aircraft, totaled 424.8 pounds of marijuana.  The aircraft was damaged from the landing.  See id. ¶ 14, at 5.  An investigation into the aircraft revealed that Nolf was listed as the owner, and that S. Peterson had a valid pilot's license.  See id. ¶ 15, at 6.

A federal arrest warrant was issued for S. Peterson on May 10, 2010.  See PSR ¶ 16, at 6.

---

[7]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme Court provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

The Criminal Complaint as to S. Peterson provides that his actions violate 21 U.S.C. § 846, and 21 U.S.C. § 841(a)(1), for having "[k]nowingly and willingly conspire[d] to distribute over 100 kilograms or more of a mixture or substance containing a detectible amount of marijuana, a controlled substance."  Criminal Complaint at 1, filed May 10, 2010 (Doc. 1).  Two active Drug Enforcement Administration investigations relating to narcotics were pending as to S. Peterson at the time of these events.  See id. ¶ 15, at 5.

## PROCEDURAL BACKGROUND

S. Peterson was arrested on June 2, 2010, in Louisville.  See Arrest Warrant at 1, filed June 7, 2010 (Doc. 4).  The Indictment charges S. Peterson and Nolf with violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), "possession with intent to distribute 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana," 21 U.S.C. § 846, Conspiracy, and 21 U.S.C § 2, Aiding and Abetting.  Indictment at 1, filed June 24, 2010 (Doc. 14).

S. Peterson entered into a Plea Agreement on October 19, 2011.  See Doc. 123.  S. Peterson pled guilty to the charged violations of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(B), possession with intent to distribute 100 kilograms and more of a mixture and substance containing a detectable amount of marijuana, and 21 U.S.C. § 846, Conspiracy.  See Plea Agreement ¶ 3, at 2.  S. Peterson stipulated that he conspired with Nolf to knowingly possess and distribute 198.2 kilograms of marijuana.  See Plea Agreement ¶ 7, at 3.  The parties agree that S. Peterson's base offense level under the sentencing guidelines is 26, pursuant to U.S.S.G. § 2D1.1(c)(7), as the amount of marijuana attributable to S. Peterson it at least 100 kilograms, but less than 400 kilograms.  See Plea Agreement ¶ 9(a), at 4.  The parties also agree to S. Peterson receiving a 3-level reduction from his base offense level, pursuant to U.S.S.G. § 3E1.1, for having demonstrated a recognition and affirmative acceptance of personal responsibility for his conduct.  See Plea Agreement ¶ 9(b), at 4.

S. Peterson also stipulated to his commission of two previous felony offenses: (i) complicity to traffic more than five pounds of marijuana, of which he was convicted by a Kentucky state court in February, 2006; and (ii) cultivation of five or more plants of marijuana, for which he was convicted by a Kentucky state court in February, 2006.  See Plea Agreement ¶ 11, at 7.  The parties did not stipulate to a role adjustment.  See Plea Agreement at 1-10.  S. Peterson waived his right to appeal his conviction, and any sentence within or below the applicable advisory guidelines range as determined by the Court.  S. Peterson "specifically agrees not to appeal the Court's resolution of any contested sentencing factor in determining the advisory sentencing guideline range."  Plea Agreement ¶ 13, at 7.  In exchange for S. Peterson's stipulations, the United States agreed to not bring additional criminal charges against him based on the facts underlying the Indictment, and to not file an enhancement pursuant to 18 U.S.C. § 851 for either conviction, even though S. Peterson admits that his convictions are subject to the § 851 enhancement.  See Plea Agreement ¶ 14, at 8.

The USPO determined that S. Peterson's base offense level is 26, pursuant to U.S.S.G. § 2D1.1(c)(7), as at least 100 kilograms but less than 400 kilograms of marijuana is attributable to him for his violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  See PSR ¶ 26, at 7.  Pursuant to U.S.S.G. § 3B1.3, S. Peterson receives a 2-level upward adjustment for using the "special skill" of aircraft piloting in the commission of the offense, making his adjusted offense level 28.  PSR ¶¶ 31-32, at 8-9.  S. Peterson also receives the career offender enhancement, pursuant to U.S.S.G. § 4B1.1, because he was at least eighteen years old at the time of this felony offense, and he has two previous qualifying felony convictions on his record, making his offense level 34.  See PSR ¶ 33, at 9.  S. Peterson receives, pursuant to U.S.S.G. §3E1.1, a 3-level reduction for having accepted responsibility.  See PSR ¶ 34, at 9.  The USPO thus calculates S. Peterson's total offense level at 31.  See PSR ¶ 35, at 10.

-9-

S. Peterson receives 1 criminal history point for each of his three adult criminal convictions, giving him a criminal history category of II.  Because S. Peterson's convictions qualify him for the career offender status, under U.S.S.G. § 4B1.1, his criminal history category is VI.  See PSR ¶ 40, at 13.  An offense level of 31 and a criminal history category of VI give S. Peterson a guidelines sentencing range of 188-235 months.

On March 30, 2012, S. Peterson filed his Objections to PSR.  S. Peterson first objects to the PSR being based on information which was not provided to him.  See Objections to PSR at 1-2.  S. Peterson asserts that his due-process rights may be violated by the United States not providing him with a "meaningful opportunity to present a complete defense when discovery was provided to the Probation Office which was not provided to" him.  Objections to PSR at 2.

S. Peterson also contests several facts and characterization of facts in the PSR.  S. Peterson asserts that "there are two statements in the PSR which misleadingly imply that S. Peterson was entirely uncooperative with the initial law enforcement investigation."  Objections to PSR at 2.  S. Peterson contends that this "characterization" of his behavior is "inaccurate and unjustified."  Objections to PSR at 2.  S. Peterson asserts that he was cooperative and that evidence supports his compliant demeanor.  See Objections to PSR at 2-3.  Additionally, S. Peterson contends that paragraph 13 of the PSR, which states that he would "not provide a statement without an attorney," is incorrect.  Objections to PSR at 3.  S. Peterson contends that he spoke with officers at the Microtel Inn, and answered officers' questions at the NMSP office, and that he requested an attorney only "after speaking with officers at length concerning their investigation."  Objections to PSR at 3.  S. Peterson also asserts that paragraph 15 of the PSR, which states that S. Peterson had "two active narcotic investigations pending" at the time of the instant offense, is incorrect.  Objections to PSR at 3.  S. Peterson asserts that this statement refers to "unrelated contacts Peterson had with law

enforcement in 2003 and 2009; neither of which involved further investigation, an arrest, or criminal charges."  Objections to PSR at 3-4.  S. Peterson also asserts that neither of these interactions involved narcotics.  See Objections to PSR at 4.  S. Peterson requests that the Court either redact this statement from the PSR, or clarify the statement to explain that the alleged "investigations" were "extremely limited, no longer actively being investigated, and did not involve narcotics."  Objections to PSR at 5.  S. Peterson also contends that paragraphs 18 and 19 of the PSR are incorrect, in that he neither insured nor owned the aircraft at issue.  See Objections to PSR at 5.

S. Peterson also contends that paragraph 19 of the PSR "inaccurately describes Peterson's relationship to Nolf's activities."  Objections to PSR at 6.  S. Peterson contends that, contrary to PSR paragraph 19, Nolf had a "much weightier role in the offense."  Objections to PSR at 6.  S. Peterson argues that, because Nolf located, purchased, and financed the airplane, and then found Peterson to operate the airplane, Nolf was the "organizer of the instant offense."  Objections to PSR at 6.  S. Peterson asserts that his "role was so limited that he was not even left in control of the marijuana without Nolf's immediate supervision."  Objections to PSR at 6.  S. Peterson states that he acted as Nolf's "driver."  Objections to PSR at 6.  S. Peterson asserts that paragraph 19 of the PSR should be changed to reflect these facts.  See Objections to PSR at 6.

S. Peterson also objects to the USPO's computations.  First, S. Peterson contends that paragraph 29 of the PSR is inaccurate, in that it does not allow him to have a mitigating role.  S. Peterson contends that his role was limited to "piloting the vehicle."  Objections to PSR at 6-7.  S. Peterson contends that, to the extent paragraph 29 of the PSR is based upon information which was not released to him "the information cannot constitutionally be used as a basis for his sentencing."  Objections to PSR at 7.  S. Peterson asserts that his role as Nolf's driver was even more of a mitigated role than that of a "'mule' . . . when the transporter is in sole custody and control of the

narcotics during transit."  Objections to PSR at 8 (quoting United States v. Lockhart, 37 F.3d 1451, 1452-53 (10th Cir. 1994)).

S. Peterson argues he should receive a downward departure.  S. Peterson states that a court "may depart from the Guidelines on the basis of any factor not adequately considered by the Guidelines."  Objections to PSR at 8 (citing United States v. Smith, 930 F.2d 1450, 1454 (10th Cir. 1991)).  S. Peterson argues that there are there are several grounds upon which the Court may depart: (i) his background; (ii) his military service; (iii) the over-representation of his criminal history under the Sentencing Guidelines; (iv) his role in this federal offense; (v) his rehabilitative efforts; and (vi) these factors in combination.  See Objections to PSR at 9, 17.

Regarding his background, S. Peterson contends that, because he was raised without his father, and his interactions with his father were brief, his "childhood is not different than that of a child suffering severe abuse."  Objections to PSR at 9.  S. Peterson argues that he was subject to "profound feelings of inadequacy, isolation, confusion, low self-esteem, and guilt," which impacted his adult criminal activities.  Objections to PSR at 9 (citing United States v. Rivera, 192 F.3d 81, 85 (2d Cir. 1991)).

S. Peterson also asserts that "there was nothing he desired more than to serve his nation to the best of his abilities," which is why he enrolled in the military after high school.  Objections to PSR at 10.  S. Peterson points out that military service is a relevant factor in determining whether to depart under U.S.S.G. § 5H1.11.  S. Peterson assert that, although his time of service was short, his military service was characterized by his "drive and leadership abilities," and his superiors recognized his "honesty, trustworthiness, ambition/motivation, leadership, loyalty, courage, respect, positive attitude, desire to remain a marine, ability to accomplish any mission assigned and potential for future honorable service."  Objections to PSR at 10-11.  S. Peterson states that he was

"devastated" to leave the Marines.  Objections to PSR at 11.  S. Peterson points out that he was honorably discharged on account of an eye injury.  See Objections to PSR at 11.

S. Peterson also asserts that the career offender enhancement under U.S.S.G. § 4B1.1 over-represents his criminal history.  See Objections to PSR at 11.  S. Peterson points out that a court may depart downwardly when a criminal history category "'over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.'" Objections to PSR at 12 (quoting U.S.S.G. § 4A1.3(b)).  S. Peterson contends that, because his career offender enhancement is based upon two "relatively minor offenses which resulted in probated sentences," the enhancement is an over-representation of the seriousness of his history and his likelihood of recidivism.  Objections to PSR at 12.

S. Peterson points out that, without the career offender enhancement, he would have only 3 criminal history points, giving him a criminal history category of II, with an adjusted offense level of 25 providing for a guidelines range of 57 to 71 months for his sentence.  See Objections to PSR at 13.  S. Peterson emphasizes that this range is one-third of that which he incurs with the career offender enhancement.  S. Peterson contends that, because his previous sentences were for probated terms, he has never spent time in prison, which he asserts distinguishes his case from the "heartland" of individuals who receive the career offender enhancement.  Objections to PSR at 13.  S. Peterson also points out that his previous convictions have not involved violent offenses, or were related to "hard narcotics such as crack, cocaine, [or] methamphetamine."  Objections to PSR at 14 (citing United States v. Wilken, 498 F.3d 1160, 1165 (10th Cir. 2007); United States v. Friedman, 554 F.3d 1301, 1309 (10th Cir. 2009)).  S. Peterson thus contends that a "departure to bring [his] sentence more in tune with his true criminal history category . . . is appropriate and necessary;" S. Peterson asserts that his true criminal history category is II.  Objections to PSR at 14.

S. Peterson also asserts that, because his criminal history category would be II without the career offender enhancement, the enhancement over-represents the likelihood that he will recidivate. S. Peterson asserts that a defendant with a criminal history category of II is much less likely to commit further crimes than a defendant with a criminal history category of VI.  See Objections to PSR at 15 (citing United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (May, 2004), http://www.ussc.gov/research/research_publications/recidivism/200405_recidivism_criminal_his tory.pdf).  S. Peterson also argues that, because he is close to forty-years old, he is reaching the age at which, he asserts, he is much less likely to re-offend.  See Objections to PSR at 15.  S. Peterson contends that criminal history points are a better indicator of recidivism than a defendant's criminal history category, and that his total criminal history points are 3.  S. Peterson points out that his 3 criminal history points are "one-forth that [of what is] necessary to qualify for a [criminal history category] of VI where Peterson is now being placed."  Objections to PSR at 16.  S. Peterson maintains that defendants who receive the career offender enhancement based "solely upon prior drug convictions are significantly less likely to reoffend.[sic]"  Objections to PSR at 16 (citing United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 134 ( N o v . 2 0 0 4 ) , http://www.ussc.gov/research/research_projects/miscellaneous/15_year_study/15_year_study_fu ll.pdf).

S. Peterson also asserts that a departure is warranted because he "did not have control over the amount of marijuana he was to assist Nolf in transporting," which S. Peterson argues shows his minor role in the offense.  Objections to PSR at 17.  S. Peterson additionally contends that "Nolf was

more culpable, [but] it appears likely that, based upon a motion from the Government relating to cooperation, Nolf may receive a substantially lower sentence than is recommended . . . for Peterson." Objections to PSR at 17.  S. Peterson contends that, if Nolf is receiving a lower sentence for his cooperation, "such a position inaccurately portrays the circumstances of this matter." Objections to PSR at 18.  S. Peterson points out that he did not flee from law enforcement or hide from authorities, as he asserts that Nolf did.  S. Peterson asserts that, if Nolf is receiving a lesser sentence for having provided information to the United States regarding "higher-level traffickers," Nolf only had that information because he "was the individual in contact with those other traffickers while Peterson was only in contact with Nolf." Objections to PSR at 18.  S. Peterson contends that the United States was willing to "sit down" with S. Peterson only if he provided similar information, which S. Peterson asserts that he "did not have due to the limited nature of his involvement in this enterprise." Objections to PSR at 18.  S. Peterson argues that he was willing to give what limited information he had to the United States, and that he "should not be punished for the tactical decisions of the Government based on other cases which are unrelated to Peterson." Objections to PSR at 18 (internal emphasis omitted).

Lastly, S. Peterson contends that his post-offense rehabilitation warrants a departure.  S. Peterson points out that he began to conquer his drug addiction on his own.  S. Peterson asserts that he has begun a new life of sobriety "without access to professional rehabilitation centers or programs such as those which he will seek to avail himself within the Bureau of Prisons." Objections to PSR at 18.  S. Peterson asserts that "in cases such as this . . . departures perform an integral function in sentencing by allowing the court to impose an appropriate sentence because a mechanical application of the Guidelines fails to achieve the statutory purposes and goals of sentencing." Objections to PSR at 19.  S. Peterson contends that the factors of which he has

apprised the Court "weigh in favor of a significant downward departure."  Objections to PSR at 19.

S. Peterson also requests a "significant variance from the appropriate advisory Guideline sentencing range."  Sentencing Memo. at 3.  S. Peterson asserts that a "highly mitigated sentence is not only warranted, but also mandated by the legislative commands of 18 U.S.C. § 3553(a)." Sentencing Memo. at 2.  First, S. Peterson asserts that his history and characteristics support a reduced sentence.  S. Peterson points to his military history, and argues that, "albeit cut unfortunately short by circumstances beyond his control," his military history demonstrates his courage and loyalty, and that he has made a person sacrifice for society.  Sentencing Memo. at 4 (citing U.S.S.G. § 5H1.11; United States v. Pipich, 688 F. Supp. 191, 193 (D.Md. 1988)).  S. Peterson points to the Statements of Character Concerning Peterson, filed Mar. 30, 2012 (Doc. 138-2)("Statements of Character"), which were completed by individuals who worked with S. Peterson in the Marine Corps, and notes that although he was required to be discharged, that several individuals stated they would continue to serve with him with enthusiasm.  See Sentencing Memo. at 4.  S. Peterson also points out that he "earned extraordinarily high marks in the areas of honesty, trustworthiness, motivation, work performance, leadership, courage, loyalty, respect, positive attitude, and potential for future honorable service" in the Statements of Character.  Sentencing Memo. at 5.  S. Peterson asserts that his military history, and his positive character, as referenced in the Statements of Character, "indicate that [he] is willing, and indeed fully capable, of returning as a positive influence on society."  Sentencing Memo. at 6.  S. Peterson asserts that his character helped him to combat his addiction, and shows that he will succeed in the future.  See Sentencing Memo. at 6.

S. Peterson also contends that his lack of youthful guidance counsels in favor of a variance. S. Peterson states that his father "actively disavowed him as a child."  Sentencing Memo. at 6.  S.

-16-

Peterson points out that his father only met him once as a child, after his father "fought tooth-and-nail in the courts to avoid recognizing him for years." Sentencing Memo. at 6. S. Peterson states that his only meeting with his father was "for approximately 15 minutes at a race track," and that his father has not contacted him since that meeting. Sentencing Memo. at 6. S. Peterson states that he grew up without an appropriate male role model and that his mother had to work several jobs to provide for the family. Sentencing Memo. at 6. S. Peterson asserts that a "lack of youthful guidance" such as he experienced has been recognized as a mitigating factor when sentencing a defendant. Sentencing Memo. at 6 (citing United States v. Floyd, 945 F.2d 1096, 1099 (9th Cir. 1991)). S. Peterson contends that his lack of guidance mitigates his criminal liability. He also asserts that "the Court need look no further than Defendant's success in the Marine Corps to recognize how Defendant performed as a youth when given proper guidance." Sentencing Memo. at 7.

S. Peterson also argues that his post-offense rehabilitative efforts warrant a variance. S. Peterson admits that he developed a drug problem after leaving the Marines, and he states that his drug problem worsened just before the offense, when his grandmother died. S. Peterson contends, however, that he "undertook rehabilitation on his own initiative, showing a profound recognition of self and commendable personal growth." Sentencing Memo. at 7. S. Peterson asserts that his successful self-rehabilitation shows that he is likely to succeed in the future. See Sentencing Memo. at 8.

S. Peterson also argues that the goals of sentencing would be met if the Court grants him a variance. See Sentencing Memo. at 8. S. Peterson asserts his offense is "not as serious as suggested by the Guidelines under the career offender" enhancement. Sentencing Memo. at 9. In making this argument, S. Peterson points out that there were no guns involved in the drug trafficking, and that

marijuana is not a hard narcotic, such as heroin or cocaine.  S. Peterson also reiterates, in arguing for a variance, that the career offender enhancement is "severely misleading as to the seriousness of his history," again pointing out that his criminal history category would be II without the enhancement.  Sentencing Memo. at 9.

S. Peterson also argues that the need for "just punishment" is served by granting him a variance.  Sentencing Memo. at 10.  S. Peterson states that "[a]ny prison term would mean more to Defendant than an individual with a prior prison experience."  Sentencing Memo. at 10 (citing United States v. Baker, 445 F.3d 987, 992 (7th Cir. 2006)).  S. Peterson asserts that "a rigid application of the Guidelines and a failure to appropriately vary downward would suggest to all that the system is incapable of treating those who find themselves caught in it as individuals." Sentencing Memo. at 11.

S. Peterson argues that a variance will accomplish deterrence and rehabilitation.  S. Peterson points to the disparity between his previous sentences, and the sentence he will receive without a variance, and asserts that a sentence for him without a variance "would create an unreasonably excessive deterrence."  Sentencing Memo. at 12.  S. Peterson also asserts that a sentence without a variance would "create roadblocks to Defendant's pursuit of sobriety and future success in his rehabilitation . . . ."  Sentencing Memo. at 12.  S. Peterson contends that, because he has never served prison time before this conviction, "the deterrent effect of a shorter sentence, such as [] five years . . . will be far greater than it would be for the typical individual technically falling within the purview of a career offender designation."  Sentencing Memo. at 12-13 (citing United States v. Mishoe, 241 F.3d 214, 220 (2nd Cir. 2001)).  S. Peterson again argues that, because his previous convictions were all for drug violations, and he is thirty-six years old, the likelihood that he will reoffend is very low.  See Sentencing Memo. at 13-14.

-18-

S. Peterson also contends that a variance will serve rehabilitation.  S. Peterson asserts that his self-rehabilitative efforts, combined with his desire to participate in the 500-hour Bureau of Prisons drug program, show that he will succeed in rehabilitating himself.  See Sentencing Memo. at 15.  S. Peterson thus argues that "a lengthy prison term is unreasonable and unnecessary to accomplish this particular goal of sentencing."  Sentencing Memo. at 16.

In response to S. Peterson's Sentencing Memo, the USPO disclosed a Second Addendum to the Presentence Report, dated Apr. 3, 2012 ("Second Addendum").  Regarding S. Peterson's objection to the description of him as "uncooperative" in paragraph 12 of the PSR, the USPO responds that this description is a "direct statement from a report received directly" from the NMSP, which relates that NMSP was dispatched to a Tucumcari hotel to assist deputies with an "uncooperative male."  Second Addendum at 1.  Regarding S. Peterson's objection to paragraph 13 of the PSR, which S. Peterson contends incorrectly states he would not provide a statement without an attorney, the USPO states that in both a report submitted by the Department of Homeland Security Immigration and Customs Enforcement ("HSICE"), and a report from the NMSP, officers note that S. Peterson chose not to make a statement during an interview and requested an attorney. See Second Addendum at 1-2.  Regarding S. Peterson's objections to paragraph 15 of the PSR, which states that he had "two active narcotic investigations pending" when apprehended, the USPO explains the circumstances of two previous interactions which S. Peterson had with law enforcement, and notes that the "final outcome of the law enforcement contact is unknown."  Second Addendum at 2.  The USPO defers to the discretion of the Assistant United States' Attorney handling the case whether this information should remain in the PSR, and the USPO made no changes to the PSR based upon S. Peterson's objection.  See Second Addendum at 3.  Regarding S. Peterson's objection to paragraphs 18-19 of the PSR, which he asserts falsely list him as the

aircraft's insurer, the USPO reports that the department of HSICE agents verified S. Peterson's status as the insurer of the aircraft through the HSICE investigation.  See Second Addendum at 3.

The USPO also asserts, regarding S. Peterson's objection to the unavailability of a role adjustment, that he has not put forward any evidence to show that he had a mitigated role in the offense.  See Second Addendum at 3-4.  Regarding S. Peterson's objection that his military service warrants downward departure, the USPO asserts that military service must be "present to an unusual degree and distinguish[] the case from typical cases covered by the guidelines" to be the basis of a departure.  Second Addendum at 4 (quoting U.S.S.G. § 5H1.11).  The USPO posits that S. Peterson's brief military service does not take his case out of the heartland of cases.  See Second Addendum at 4.  Regarding S. Peterson's objection to the career offender enhancement, the USPO asserts that S. Peterson "appears to have a pattern of criminal activity and drug trafficking that fall within the purview of the instant offense and [are of a] similar nature to those listed in [his] criminal history category," and thus no departure is warranted.  Second Addendum at 4-5.  Additionally, the USPO points out that a defendant who qualifies as a career offender may receive a downward departure of only 1 level, pursuant to U.S.S.G. § 4A1.3(b)(3)(A), and not the 2 which S. Peterson requests.  See Second Addendum at 4.  Lastly, regarding S. Peterson's contention that his lack of guidance as a youth is a basis for a downward departure, the USPO points out that S. Peterson listed no mental or emotional problems, and he did not have infractions as a juvenile, which show that his childhood was not so lacking in guidance as to warrant a departure.  See Second Addendum at 5.

The United States opposes S. Peterson's requests in his Objections to PSR and Sentencing Memo.  See United States Sealed Sentencing Memorandum and Response in Opposition to Defendant's Objections to the Presentence Investigative Report, filed Apr. 23, 2012 (Doc. 141)("Response").  Regarding S. Peterson's objection to being characterized as "uncooperative" in

the PSR, the United States asserts that S. Peterson told a false story when the NMSP officers first approached him, demonstrating that he was uncooperative.  Response at 2.  The United States asserts that the two investigations which S. Peterson contests were not "ongoing" are indicative of his previous attempts to smuggle drugs and should be included in the PSR.  Response at 3-4.  The United States also asserts that S. Peterson had an interest in the aircraft, in that S. Peterson "accompanied Nolf to the aircraft purchase and met with the sellers of the plane," and informed the sellers that he "would insure the aircraft."  Response at 5.  On this basis, the United States asserts that S. Peterson is not being entirely truthful in attempting to disassociate any ownership interest in the airplane.  See Response at 5.

The United States contends that S. Peterson was a partner to Nolf, and not just a driver.  The United States points out that the marijuana was en route to Kentucky, S. Peterson's home, when apprehended by authorities.  The United States thus posits that S. Peterson intended to participate in distribution of the marijuana in his home state, where, the United States alleges, S. Peterson "operated an interstate marijuana trafficking ring," as seen in S. Peterson's criminal history of other drug offenses.  Response at 5-6.  The United States asserts that the "similarities between Defendant's prior conduct and the present offense . . . are too great to ignore."  Response at 6.  The United States further asserts that there is "[n]o evidence to suggest that one defendant operated at the behest of the other."  Response at 7.

The United States also asserts that S. Peterson is not entitled to a role adjustment nor permitted to receive one.  The United States points out that S. Peterson does not contest that his criminal history qualifies him for the career offender enhancement and contends that S. Peterson has not presented any evidence to show that his role was minor.  See Response at 7-9. The United States asserts that S. Peterson's military history is unremarkable, because of its brief nature, and because

his rank of Lance Corporal is "a near automatic promotion a Marine would receive after nine months of service."  Response at 9.  The United States asserts that S. Peterson, as a "grown man," should not be arguing that because he was raised by a single mother the Court should depart downwardly, and the United States posits that requesting a departure on such grounds is "insulting."  Response at 10.

The United States argues that S. Peterson's criminal history is not overstated, pointing out that S. Peterson has numerous drug trafficking convictions, as well as arrests for drugs and assault. See Response at 10-11.  The United States contends that S. Peterson's continued involvement with drug trafficking shows that his risk of recidivism will be high and not low.  See Response at 10-11. The United States also argues that S. Peterson's due-process rights have not been violated and asserts that S. Peterson did not request any documentation until after filing his Objections to PSR. See Response at 12.

Regarding S. Peterson's request for a variance, the United States points to his criminal history, contending that "he is no stranger to the interstate smuggling of bulk marijuana," and argues that the nature and circumstances of the offense demonstrate that S. Peterson is experienced and uses sophisticated techniques in drug smuggling.  Response at 13-14.  Regarding S. Peterson's history and characteristics, the United States contends that, "despite numerous second chances, Defendant continues to traffic drugs, and does so in an increasingly sophisticated way."  Response at 14.  The United States asserts that S. Peterson's personal characteristics are "unremarkable" and that nothing in his situation "places him outside the heartland of similarly-situated defendants."  Response at 14. The United States also looks to what it calls S. Peterson's "extensive history of drug abuse," and, while admitting that he "appear[s] to be making an effort to avoid further drug use, [and to] seek treatment," the United States argues that the Bureau of Prison's 500-hour drug program is the best

way to meet his rehabilitative needs.  Response at 14.  The United States asserts that S. Peterson has

no remarkable educational or vocational background.  The United States argues that the seriousness

of S. Peterson's offense warrants a sentence within the guidelines range so as to promote respect for

the law and provide just punishment.  See Response at 15.

The Court addressed S. Peterson's motions at its sentencing hearing.  See Transcript of

Hearing (taken Apr. 26, 2012)("Tr.").[8]  The Court began by suggesting a change to the Second

Addendum to the Presentence Report.  See Tr. at 3:3-5 (Court).  The Court noted that on page 2 of

the Second Addendum, in Response No. 3, the sentence beginning "[a]gents ran the defendant's

arrest record and found he prior charges," should be amended to read: "Agents ran the defendant's

arrest record and found he had prior charges . . . ."  Tr. at 3:7-10 (Court).  No party objected to the

change.  See Tr. at 3:11-21 (Blackburn, Court, Ganjei).

The Court then addressed S. Peterson's request that paragraph 12 of the PSR, which states

that S. Peterson was an "uncooperative male," have the word "uncooperative" removed.  Tr. at 3:12-

18 (Court).  The United States stated that its "position is that its not necessary."  Tr. at 3:19-21

(Ganjei).  The Court suggested that the term is a "characterization" and proposed that the word be

deleted so that the phrase reads "a male."  Tr. at 3:22-4:3 (Court).  S. Peterson stated that such an

alteration would satisfy his request.  See Tr. at 4:5-7 (Blackburn).

The Court then addressed S. Peterson's objection to paragraph 13 of the PSR.  See Tr. at 4:8-

11 (Court).  The Court asked the United States if the PSR needs to state that S. Peterson "would not

provide a statement without an attorney."  Tr. at 4:10-11 (Court).  The United States asserted that

the information is relevant to whether S. Peterson was cooperative and would deserve a lower-

---

[8]The Court's citations to the transcripts of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

sentence because of his cooperation.  See Tr. at 4:12-16 (Ganjei).  The United States posited that the information "demonstrates that indeed he was not providing all the information he knew at the time to law enforcement."  Tr. at 4:16-18 (Ganjei).  The United States asserted that, because it does not know exactly what S. Peterson will argue regarding his cooperation, that information in paragraph 13 of the PSR is important.  See Tr. at 4:18-21 (Ganjei).

The Court inquired of S. Peterson whether he still objects to paragraph 13 of the PSR, "given the response in the [S]econd [A]ddendum, which gives your version of the facts but also states where the probation officer got this information."  Tr. at 4:22-25 (Court).  The Court suggested that it could overrule S. Peterson's objection to paragraph 13 of the PSR as moot in light of the Second Addendum and S. Peterson stated "that's fine."  Tr. at 5:5-7 (Court, Blackburn).

Regarding S. Peterson's objection to paragraph 15 of the PSR, which states that "investigation of Peterson revealed he had two active narcotic investigations pending," the Court suggested that it could resolve S. Peterson's objection that the investigations were not still active by inserting the word "then" such that the phrase would read "investigation of S. Peterson revealed he had two then active narcotic investigations pending."  Tr. at 5:8-14 (Court).  The United States stated that it is comfortable with that revision.  See Tr. at 5:15 (Ganjei).  S. Peterson also stated that he is comfortable with that revision, because "there's no evidence whether they're continuing to be active."  Tr. at 5:17-20 (Blackburn).

Regarding S. Peterson's objection that he neither owned nor insured the aircraft, contrary to what is set forth in paragraphs 18-19 of the PSR, the Court stated that it was "inclined to think that the . . . evidence I had wasn't sufficient . . . for the Court to find that he was actually the insurer of the vehicle because I'm not sure he[ has] any insurance."  Tr. at 5:21-25 (Court).  The Court noted that S. Peterson said he was going to get insurance, but the Court also noted that it was unsure

-24-

whether S. Peterson actually followed through and got the insurance, and thus, the Court stated it was inclined to sustain the objection "as far as finding that he was the insurer but then leave these [other] facts in."  Tr. at 5:25-6:6 (Court).  The United States argued that the PSR contains information relayed to the USPO, and thus, to the extent those paragraphs state that S. Peterson represented that he had insurance, the paragraphs are not factually incorrect.  See Tr. at 6:7-13 (Ganjei).  The United States admitted, however, that the issue of whether S. Peterson had or purchased insurance is probably not "entirely necessary" for the Court to address.  Tr. at 6:13-15 (Ganjei).  The United States argued, in the alternative, that S. Peterson's representation regarding insurance "goes to the overall scope of the [D]efendant's involvement in the case."  Tr. at 6:15-17 (Ganjei).

The United States asked if S. Peterson's concerns regarding paragraphs 18-19 were addressed "given that it says 'according to the case agent'" in the PSR.  Tr. at 6:19-20 (Court)(reading from PSR ¶ 18, at 6).  S. Peterson admitted that the issue is "de minimis in the whole scope of everything," but stated that he is still not quite satisfied by merely noting that the paragraph says "according to the case agent." Tr. at 6:21-7:7 (Blackburn).  The Court suggested that it could leave the paragraph as written, but add a sentence at the end of paragraph 18 which states that "the Court cannot find, however, by a preponderance of the evidence before the Court that Peterson in fact insured the aircraft."  Tr. at 7:9-11 (Court).  S. Peterson stated that he has no objection to such a writing.  See Tr. at 7:14-16 (Blackburn).  The Court inquired whether the United States had additional evidence regarding S. Peterson having owned and insured the aircraft, and the United States stated that it does not.  See Tr. at 7:17-20 (Court, Ganjei).  The Court noted that it would also need to take out the portions of paragraph 19 which refer to S. Peterson insuring the aircraft.  See Tr. at 8:3-8 (Court).  S. Peterson stated that his objection would be satisfied by the

Court's suggested changes to paragraphs 18-19, and the Court thus indicated that it would sustain in part and overrule in part S. Peterson's objection to paragraphs 18-19 of the PSR. See Tr. at 7:21-24 (Court, Blackburn); id. at 8:21-25 (Court, Blackburn).

The Court then turned to S. Peterson's objection to paragraph 29 of the PSR, arguing that he should receive a minor role adjustment. See Tr. at 9:10-11 (Court). The Court pointed out that the United States' position seems to be that S. Peterson can receive a role adjustment, but it would come before the career criminal enhancement under United States v. Jeppeson, 333 F.3d 1180 (10th Cir. 2003). Tr. at 9:10-17 (Court). S. Peterson admitted that the Court's understanding is correct. See Tr. at 9:19-20 (Court, Blackburn). S. Peterson stated that, in the whole scope of things, whether a defendant is a minor participant does not make a big difference under the United States Court of Appeals for the Tenth Circuit's case law. See Tr. at 10:7-13 (Blackburn).

S. Peterson stated, however, that if the Court were to agree that he should receive a role adjustment, it would bring down his total offense level and possibly enhance S. Peterson's main argument that the career offender enhancement overestimates the circumstances of the case. See Tr. at 10:14-23 (Blackburn); id. at 11:2-6 (Blackburn). S. Peterson stated that his minor role could be another way for the Court to vary in administering his sentence. See Tr. at 12:21-23 (Blackburn).

Noting that the defendant bears the burden to establish that he or she is entitled to a role adjustment, the Court explained previous instances in which the adjustment was given. See Tr. at 13:2-4 (Court). The Court noted that couriers in a drug transaction, if they are only couriers, often receive a minor role adjustment. See Tr. at 13:6-7 (Court). The Court stated, however, that its picture of S. Peterson "is that he had sort of full knowledge of the drug conspiracy, that he knew who was selling the drugs to him [in] November . . . and then he had some knowledge of what was going to be done with them at the end." Tr. at 13:8-12 (Court). The Court stated that S. Peterson's

-26-

role thus appears to be "a little bit more than just being a courier."  Tr. at 13:12 (Court).  The Court pointed out that, because S. Peterson had an airplane, and people would come to him with drugs and he would fly them somewhere, and because S. Peterson was involved in purchasing the marijuana, his role was not that of a courier.  See Tr. at 13:12-17 (Court).

 S. Peterson responded that the Plea Agreement sets forth that S. Peterson knew that his airplane would carry marijuana, and that there was a conspiracy, but that the Plea Agreement does not include S. Peterson's involvement in the purchase.  See Tr. at 13:20-24 (Blackburn).  S. Peterson contended that his co-Defendant, Nolf, arranged to purchase the marijuana.  See Tr. at 13:25-14:1 (Blackburn).  S. Peterson admitted that he was not acting in the same manner as a commercial airliner, in that he was not contending that people would just come to him and he would fly them to locations.  See Tr. at 14:3-6 (Blackburn).  S. Peterson thus argued that the purchase of the marijuana was not in his purview.  See Tr. at 14:14-16 (Blackburn).

 The Court pointed out that the Tenth Circuit requires a district court to determine "who the average participant is" in a drug conspiracy, and the Court asked S. Peterson who an average participant would be in this case.  Tr. at 14:18-21 (Court).  S. Peterson responded that an average person would be "aware of the conspiracy, . . . know the intent of the conspiracy, [be] part of the conspiracy, and . . . clearly participate in the conspiracy [and] has the knowledge of everything." Tr. at 15:6-10 (Blackburn).  S. Peterson asserted that the United States may argue that his role is more active than a courier who drives a car.  See Tr. at 15:11-16 (Blackburn).  The Court pointed out that it is undisputed whether S. Peterson participated in purchasing the airplane, and S. Peterson admitted that he was "aware of it and was . . . there" at the purchase.  Tr. at 15:17-23 (Court, Blackburn).

 Turning to the United States, the Court inquired what additional facts the United States

believes show that S. Peterson is more than just a courier.  See Tr. at 16:4-9 (Court).  The United States posited that a courier is normally not aware of the scope of the entire conspiracy, such as when a defendant drives "a vehicle with a huge amount [of] very concentrated say methamphetamine[,] cocaine[,] or heroin[,] and . . . the conspiracy [is] probably like a dozen people."  Tr. at 16:12-17 (Ganjei).  The United States stated that the driver may receive a role adjustment, as a courier with a minor role, because otherwise, the defendant is "held responsible for more than . . . [his] involvement in the enter[prise]."  Tr. at 16:17-21 (Ganjei).  The United States pointed out that, in contrast, S. Peterson was one of two people in a drug conspiracy.  See Tr. at 16:21-22 (Ganjei).  The United States asserted that S. Peterson was acting as a distributor in the drug enterprise, and Nolf was the supplier, which is shown by S. Peterson flying the airplane to his home state of Kentucky.  See Tr. at 16:22-17:6 (Ganjei).  The United States also posited that the "marijuana never would have been transported that distance over that time without his special skill."  Tr. at 17:8-10 (Ganjei).  The United States asserted that, because there are two individuals in the conspiracy, "there's [no] way you can really say that he's a minor [participant]."  Tr. at 17:10-14 (Ganjei).

The Court inquired whether the United States believes that the people who supplied the marijuana in Tucson, Arizona were conducting an arm's length transaction and were not going to be involved in the distribution of the marijuana in Kentucky.  See Tr. at 17:25-18:4 (Court).  The United States replied, "[y]es," that its understanding from debriefing the co-Defendant Nolf is that the Defendants were not delivering the marijuana, but were planning to distribute it themselves.  Tr. at 18: 5-15 (Ganjei).  The United States asserted that, based on those facts, S. Peterson was an "average participant and . . . a [fifty]-percent shareholder" in the enterprise.  Tr. at 18:15-17 (Ganjei).

-28-

The Court inquired whether S. Peterson disputed any of the facts which the United States had set forth or if S. Peterson did not believe that the United States could prove the facts by a preponderance of the evidence such that the Court should not consider the facts. See Tr. at 18:18-21 (Court). S. Peterson responded "[n]o." Tr. at 18:22-23 (Blackburn).

The Court stated that it would overrule S. Peterson's objection requesting a minor role adjustment. See Tr. at 18:24-25 (Court); id. at 59:5-9 (Court). The Court stated that it would remember S. Peterson's arguments and come back to them when addressing S. Peterson's variance request, and the Court stated that it believes that "being involved in the purchase of the plane is probably enough to take him out of a pure courier role," and that other facts the United States put forth also show that he was not only a courier. Tr. at 18:25-19:6 (Court). The Court also stated that it believes finding one participant an average participant, and the other not, would be difficult to work out in a conspiracy such as this one. See Tr. at 19:7-10 (Court). The Court stated that it does not "think that Mr. Peterson is substantially less culpable than the average participant in this criminal enterprise, and so I'll overrule the objection" and adopt the calculations in the PSR. Tr. at 19:10-15 (Court).

The Court asked S. Peterson whether the United States has produced the documents he requested, and thereby addressed S. Peterson's due-process concern regarding access to the information in those documents. See Tr. at 19:16-19 (Court). S. Peterson affirmed that he had received the documents he requested. See Tr. at 19:20-21 (Blackburn).

The Court then turned to S. Peterson's request for a downward departure because of his military service. See Tr. at 20:9-11 (Court). S. Peterson began by referring to a case from the United States Court of Appeals for the Second Circuit; S. Peterson asserted that the Second Circuit addressed whether a district court properly granted a downward departure on its belief that

classifying a defendant as a "career criminal" was an "over-representation."  Tr. at 20:23-21:17 (Blackburn)(citing to United States v. Mishoe).  S. Peterson asserted that the Second Circuit affirmed the downward departure, in light of the "limited discretion sentencing judges have to ameliorate unduly harsh pun[ishment]," and because the "maximum statutory punishment will not always be the just punish[ment]."  Tr. at 2:6-12 (Blackburn).

S. Peterson contended that his military service, in combination with his other offense characteristics "distinguishes [this case] from the [] typical cases covered by the guidelines."  Tr. at 24:8-12 (Blackburn).  S. Peterson stated that he served for a short period of time in the Marines and that his term of service was short because of eye injuries he sustained in an accident before the Marines.  See Tr. at 24:13-19 (Blackburn).  S. Peterson pointed out that he was not dishonorably discharged.  See Tr. at 24:25-25:2 (Blackburn).  S. Peterson stated that his injuries impaired his ability to have the necessary peripheral vision to be a sharp shooter, and thus he was discharged as an "erroneous enlistment."  Tr. at 25:5-25 (Blackburn).  S. Peterson asserted that his injuries occurred in high school when he was "jumped and beat up . . . with brass knuckles."  Tr. at 26:5-13 (Blackburn).  S. Peterson stated that he received his high school diploma, was a "private first class" after basic training, and was a "lance corporal" less than a year later, and that he left the Marines with "favorable recommendations."  Tr. at 26:14-27:2 (Blackburn).  S. Peterson requested that the Court consider a variance based upon these facts.  See Tr. at 27:3-6 (Blackburn).

The United States responded by pointing out that S. Peterson's term of service was short and contended that "in essence [D]efendant is asking for [] a per se rule that if you serve in the military you are entitled to a downward adjustment."  Tr. at 27:14-18 (Ganjei).  The United States asserted that S. Peterson did not disclose his surgery for his eye injuries upon his enlistment, as he was required to do.  See Tr. at 27:20-23 (Ganjei).  The United States asserted that it does not intend to

-30-

belittle military service, but that there is no "per se rule that a reduction should apply" for a defendant's service in the military.  Tr. at 28:2-10 (Ganjei).

In response, S. Peterson contended that there is no evidence which indicates that he provided fraudulent information or did not disclose everything that was necessary at the time of his enlistment.  See Tr. at 28:14-19 (Blackburn).  S. Peterson stated that he is not asking for a per se rule.  See Tr. at 28:25 (Blackburn).  S. Peterson pointed out that "all of these people who while he was in the military with him [and] thereafter submitted documents . . . all of them said that they felt . . . that while he was [] in there" his work performance was of the "highest level."  Tr. at 29:1-5 (Blackburn).  S. Peterson contended that all three of the individuals who wrote to the Court on his behalf praised his "attention to detail[,] his leadership[,] his peacefulness[,] his loyalty[,] his [dis]position," and that all three of the individuals rated him as "excellent."  Tr. at 29:1-9 (Blackburn).  S. Peterson contended that not everybody gets recommendations like his when he or she leaves the military, and thus he is not requesting a per se standard.  See Tr. at 29:11-16 (Blackburn).

The Court stated that, although U.S.S.G. § 5H1.1. provides that a defendant's military service may be relevant in determining whether departure is warranted, the guideline also "indicates that the [] military service needs to be present to an [] unusual degree and distinguish the case from typical cases covered by the guidelines."  Tr. at 29:17-25 (Court).  The Court stated that granting a downward departure to S. Peterson for his military service would not be the equivalent of creating a per se standard that, "in any case in which there is [] an[] honorable discharge," the departure should be granted, Tr. at 30:1-3 (Court), and the Court stated that it believes S. Peterson's military service is relevant, but that the Court is "not sure that either in combination with other offender characteristics or standing alone that it's different," materially from other veterans and non-veterans

who appear before this Court Tr. at 30:9-11 (Court).  The Court noted that it does not often have military people before it, but that it also had "some trouble distinguishing his service from others who have had usually longer military service."  Tr. at 30:12-15 (Court).  The Court also stated, however, that S. Peterson's military service is "a factor that I'm going to consider in the request for a variance, . . . I do think it has some relevance."  Tr. at 30:7-9 (Court).

The Court thus stated that it would exercise its discretion "not to depart in this case because I don't believe the departure is warranted under the facts and circumstances here."  Tr. at 30:16-19 (Court).  The Court noted that "[u]nfortunately our prisons do contain people who have had military service and . . . [Peterson's] case remains within the heartland of cases that appear before the Court."  Tr. at 30:19-23 (Court).

The Court then turned to S. Peterson's contention that his criminal history category would be better represented as II, rather than VI, at which the USPO calculates S. Peterson's criminal history with the career offender enhancement.  See Tr. at 31:4-9 (Court).  S. Peterson began by reviewing his criminal history with the Court, as set forth in the PSR, and highlighted that he received fines for one adult conviction and probated sentences for his other two adult convictions. See Tr. at 31:15-33:12 (Blackburn).  S. Peterson pointed out that the career offender enhancement places his sentence in a significantly higher guidelines range.  See Tr. at 33:13-34:5 (Blackburn). S. Peterson asserted that his guidelines range would be 63 to 78 months without the career offender enhancement, but that with the status, his sentence's guidelines range is 188 to 235 months.  See Tr. at 33:20-34:1 (Blackburn).  S. Peterson argued that the circumstances of his prior convictions do not warrant him receiving such a disparate sentence on the basis of previous felony convictions alone. See Tr. at 34:3-5 (Blackburn).

S. Peterson then pointed out that, in the Fifth Circuit, the United States would have been

precluded from arguing that he is a career offender because of the stipulation to the base offense level in the Plea Agreement.  See Tr. at 34:19-24 (Linnenburger).  S. Peterson explained that, in United States v. Roberts, 624 F.3d 241 (5th Cir. 2010), the United States Court of Appeals for the Fifth Circuit addressed whether the United Sates may apply the career offender enhancement to a defendant who had stipulated to a base offense level in a plea agreement.  See Tr. at 35:6-14 (Linnenburger).  S. Peterson stated that the Fifth Circuit held in a split two-to-one decision that the career offender enhancement "submits a new base offense level" and was thus not an adjustment to the base offense level, and the United States was on that basis precluded from arguing for the higher base offense level the enhancement provides. Tr. at 35:15-21 (Linnenburger).  S. Peterson admitted "in all candor to the Court" that precedent "indicates that the Tenth Circuit considers the career offender guidelines to be an adjustment rather than [] submitting a whole new base offense level." Tr. at 35:22-36:1 (Linnenburger).  The Court asked S. Peterson if he was taking the position that the United States was violating the plea agreement in this case, and S. Peterson stated that he is not taking that position.  See Tr. at 36:2-5 (Court, Linnenburger).

S. Peterson stated that "departures on criminal history . . . [are] somewhat unique under the guidelines," and he contended that the language of the guidelines does not require a court to find unusual circumstances to believe that a defendant's criminal history is over represented by an enhancement or under represented by a departure.  Tr. at 36:6-12 (Linnenburger).  S. Peterson contended that, now that courts have more leeway since the Supreme Court of the United States' decision in United States v. Booker, 543 U.S. 220 (2005), courts are finding that "the career offender guidelines often over represent[] the seriousness of someone's past."  Tr. at 36:18-22 (Linnenburger).  S. Peterson contended that courts often find that the career offender enhancement "creates too large of a jump from previous sentences to the sentence being imposed today."  Tr. at

36:23-25 (Linnenburger).

S. Peterson contended that the key distinction between himself and the "typical career offender" is that he does not have any convictions for violent conduct in the past.  Tr. at 37:8-12 (Linnenburger).  S. Peterson contended that he could have "committed two murders prior to this and been in the same boat."  Tr. at 37:13-15 (Linnenburger).  S. Peterson contended that, by applying the career offender enhancement, the Court would be "going too far in the end of creating a deterrence," and S. Peterson argued that such a sentence would be contrary to the purpose of what a criminal history is supposed to represent.  Tr. at 37:20-24 (Linnenburger).  S. Peterson pointed out that the commentary to the sentencing guidelines provide that the purpose of a criminal history is to differentiate amongst individuals who are more culpable because of their previous behavior and provide deterrence to possible repeat offenders.  See Tr. at 37:24-38:4 (Linnenburger).  S. Peterson stated that "the biggest point that [his counsel] are trying to make, is that there's a much greater difference between the previous message of probation than a term of imprisonment."  Tr. at 38:4-6 (Linnenburger).  S. Peterson pointed out that the United States Court of Appeals for the Seventh Circuit has noted that "any prison term will have a significantly greater effect on an individual that has never been to prison than otherwise would be."  Tr. at 38:7-10 (Linnenburger).  S. Peterson also noted that the Sentencing Commission found in 2004 that the use of criminal history points is a much better predictor of recidivism and noted that, without the career offender enhancement, his criminal history category would be II, which S. Peterson stated is "obviously extremely unusual for persons who otherwise qualify for the career criminal enhancement."   Tr. at 38:12-39:2 (Linnenburger).

S. Peterson pointed out that, in United States v. Mishoe, the Second Circuit noted that the reason for the escalating offenses for repeat offenders is that repeat offenders do not seem to have

been deterred by their previous punishments.  Tr. at 39:6-14 (Linnenburger).  S. Peterson contended that "taking the extreme jump suggested by the career offender application in this case from prior sentences of probation . . . to decades [of incarceration] is far in excess of what was contemplated by the guidelines."  Tr. at 39:15-19 (Linnenburger).  S. Peterson admitted that the Court is required to consider his previous sentences when deciding whether to grant him a variance, and S. Peterson stated that he is not trying to minimize his criminal history.  See Tr. at 39:20-23 (Linnenburger).  S. Peterson admitted that, "he has participated in these activities in the past.  Obviously, that is why technically the career offender provision would apply . . . ."  Tr. at 39:23-25 (Linnenburger).  S. Peterson contended that the career offender enhancement nonetheless over-represents the seriousness of his past and would throw him " in the same boat as somebody that had committed two murders . . . ."  Tr. at 40:1-4 (Linnenburger).  S. Peterson contended that his previous felony convictions were for the "two lowest felony convictions that you can have in Kentucky" and that he received probation on those, and thus, "multiplying" his sentence by three "simply by virtue" of his previous convictions is inappropriate.  Tr. at 40:9-15 (Linnenburger).  S. Peterson asked the Court to consider what his "guideline range would be had it not been for application of this . . . ."  Tr. at 40:15-18 (Linnenburger).  S. Peterson asserted that a guidelines-range sentence without the career offender enhancement would "send a strong message and provide him an[] opportunity to turn his life around and to straighten things out."  Tr. at 40:19-22 (Linnenburger).

The United States responded that, "due to the shrewd negotiations of defense counsel," S. Peterson did not receive an enhancement under 21 U.S.C. § 851, which would have made his guidelines sentencing range from 360 months to life.  Tr. at 41:1-13 (Ganjei).  The United States thus posited that S. Peterson is essentially arguing for a windfall, because he received only the career offender enhancement and not an enhancement under 21 U.S.C. § 851.  See Tr. at 41:14-17 (Genjei).

The United States also contended that a career offender would most likely have state convictions for felony offenses, with "a gradual escalation of offenses from small to medium to large and sophisticated offenses . . . as they bec[o]me more and more accustom[ed] to conduct criminal activity." Tr. at 41:21-42:3 (Ganjei). The United States argued that S. Peterson's case presents exactly such an escalation. See Tr. at 42:3-4 (Ganjei). The United States pointed out that S. Peterson began with trafficking marijuana, then growing marijuana, and then moved on to a large-scale trafficking conspiracy in which he used many people to traffic marijuana interstate. See Tr. at 42:4-8 (Ganjei). The United States asserted that S. Peterson's current offense is "the most sophisticated operation thus far," in that he flew interstate bulk quantities of marijuana. Tr. at 42:11-13 (Ganjei). The United States also pointed out that S. Peterson has other arrests that are not counted in his guidelines sentencing range, such as his arrests for felony assault and possession of methamphetamine. See Tr. at 42:14-19 (Ganjei).

The United States contended that the Court must determine if a criminal history category of II adequately addresses S. Peterson's criminal history. See Tr. at 42:20-22 (Ganjei). The United States asserted that a criminal history category of II would "pretty clearly" not address S. Peterson's history. Tr. at 42:22-23 (Ganjei). The United States contended that S. Peterson is a career offender with a "long criminal history" that has been increasing in subsequent cases. Tr. at 43:3-6 (Ganjei). Regarding S. Peterson having been sentenced only to probation for his previous convictions, the United States posited that "this Court is no stranger to the dispar[i]ty between New Mexico state[] sentences and federal sentences here in the district." Tr. at 43:7-9 (Ganjei). The United States asserted that S. Peterson is a "typical offender" and deserves a guidelines-range sentence. Tr. at 43:16-22 (Ganjei).

The Court then stated that its "sense is that the guideline sentence that results here does

overstate his criminal history," but that, at this point in sentencing, it would be "odd to grant a downward departure . . . given the way the guidelines work." Tr. at 44:2-6 (Court). The Court stated that it is "uncomfortable with saying [] he fits in category VI, but the guidelines sort of operate in a mechanical and somewhat artificial way at this point." Tr. at 44:6-9 (Court). The Court noted that the "arguments are well taken by both sides." Tr. at 44:10-11 (Court). The Court stated that it would make an adjustment to S. Peterson's sentence through a variance because of what the Court believes is an over-representation of his criminal history. See Tr. at 44:11-14 (Court). The Court stated that it did not believe the adjustment should be made through a departure, so it would decline S. Peterson's request to grant a downward departure. See Tr. at 44:14-17 (Court).

The Court then turned to S. Peterson's request for a downward departure because of his lack of guidance as a youth. See Tr. at 44:22-44:3 (Court). S. Peterson pointed to his Objections to PSR, and stated that the Court has the possibility of departing downward because of his childhood history. See Tr. at 45:9-15 (Blackburn). S. Peterson stated that he has nothing to add to his argument besides the evidence already put forward. See Tr. at 45:15-19 (Blackburn). S. Peterson contended that, although he is now an adult, his childhood is still relevant. See Tr. at 46:7-20 (Blackburn). S. Peterson contended that the newspapers daily detail the difficulties of children who have single parents. See Tr. at 46:22-23 (Blackburn). S. Peterson admitted that whether his childhood history "rises to the level of departure is one thing," but that he has briefed his childhood so as to give the Court a whole picture of him that would also relate to granting him a variance. Tr. at 47:2-6 (Blackburn). S. Peterson said that, whether the nature of his childhood history arises to the level of a departure is "up to the Court," but whether it rises to the level of granting a variance is a "different circumstance." Tr. at 46:3-6 (Blackburn).

The United States responded, regarding whether S. Peterson's childhood history warrants

granting him a downward departure, that, "although he may have had a rough childhood," the United States does not believe that the circumstances of his childhood rises to the level which the Court would typically see as grounds for granting a departure. Tr. at 47:21-23 (Ganjei). The United States also posited that, with S. Peterson's age now at over thirty-years old, he should take responsibility and accountability for his own actions. See Tr. at 47:23-48:1 (Ganjei).

The Court stated that, under the guidelines, "generally lack of guidance" is not relevant to granting a departure, unless present in an extraordinary degree, in which case it may be relevant. Tr. at 48:10-12 (Court). The Court stated that it is difficult to distinguish S. Peterson's "rough background from many others that" the Court sees. Tr. at 48:12-14 (Court). The Court stated that it does not believe that a departure is warranted under the facts and circumstances of S. Peterson's childhood, and thus chose not to depart. See Tr. at 48:14-16 (Court). The Court noted that S. Peterson has positive characteristics, such as no history of mental or emotional health conditions, so his rough childhood did not continue to affect his physical well-being into adulthood, which is a factor that plays into not granting a departure. See Tr. at 48:17-22 (Court). The Court also noted that S. Peterson "seemed to be doing well until he was [twenty-six]," as he did not have any juvenile infractions and joined the military, which, the Court stated, indicates that "his mom did a pretty good job here." Tr. at 48:22-49:2. The Court thus stated that S. Peterson's childhood "doesn't seem to be a major contributor to the conduct that we're dealing with here." Tr. at 49:2-4 (Court). The Court stated that S. Peterson's case was not distinguishable from that of "many individuals who just didn't have a dad in their life," and thus his case remains in the heartland of cases. Tr. at 49:4-7 (Court). The Court acknowledged that, although a departure is authorized, the Court does not believe that a departure is warranted under the facts of S. Peterson's case. See Tr. at 49:8-11 (Court).

-38-

S. Peterson then argued in support of his request for a variance, and pointed to his military history, "the number of the extraordinary high remarks he received in the area of honesty [and] trustworthiness, [and] his lack of youthful guidance." Tr. at 50:15-19 (Blackburn). S. Peterson also informed the Court that he has requested to participate in the Bureau of Prisons' 500-hour drug program. See Tr. at 50:20-23 (Blackburn). S. Peterson pointed out that his guidelines sentencing range would be much lower if he did not have the career offender enhancement, and requested the Court to fashion a sentence which did not reflect the career offender enhancement. See Tr. at 51:4-8 (Blackburn).

S. Peterson spoke on his own behalf at the sentencing hearing. S. Peterson stated that he "signed my plea" and "accepted my responsibility," and that he chose not to run away from authorities and not fight his arrest. Tr. at 52:21-53:7 (Defendant). S. Peterson also stated that he had "never once in any of my charges that I've ever been convicted of . . . failed on probation[,] not once." Tr. at 53:8-10 (Defendant). S. Peterson pointed out that he had never been offered a diversion.[9] See Tr. at 53:11-12 (Defendant). S. Peterson stated that "if one time state or federal I had been offered diversion once we wouldn't have this argument." Tr. at 53:16-17 (Defendant). S. Peterson stated that he wanted to be in a federal prison back home so he could see his mother, his "one family member." Tr. at 53:21-22 (Defendant).

S. Peterson stated that he lost his grandmother the month that he was caught. See Tr. at 53:23-24 (Defendant). S. Peterson stated that he committed the crime, because he thought he could pay off the house on which his grandmother had co-signed with him and thereby avoid the probate

---

[9]A criminal diversion program is a "program that refers certain criminal defendants before trial to community programs on job training, education, and the like, which if successfully completed may lead to the dismissal of the charges." Black's Law Dictionary 564 (9th ed. 2009).

process.  See Tr. at 53:25-54:2 (Defendant).  S. Peterson stated that the house is now in foreclosure.

See Tr. at 54:2-3 (Defendant).  S. Peterson stated that he has now lost his grandfather, and his

mother will lose her son to prison, in addition to having lost her parents; S. Peterson stated that he

could have avoided another such heartache.  See Tr. at 54:3-8 (Defendant).  S. Peterson stated that

he is not "an angel" and that there are "a lot of things that happened in my life I would love to take

back," particularly, he said that if he could have figured out how to stay in the military then he

would have.  Tr. at 54:12-17 (Defendant).  S. Peterson stated that he is not running away from

responsibility, but that he wants the Court and the United States to consider that he was never

offered a diversion, which he stated would have made his offense level 23 and given him a much

lighter sentence.  See Tr. at 54:20-25 (Defendant).

The Court asked if S. Peterson was referring to receiving a diversion in state court, and S.

Peterson affirmed he was.  See Tr. at 55:4-6 (Court, Defendant).  The Court pointed out that S.

Peterson received probation in both of his previous sentences.  See Tr. at 55:7-8 (Court).  S. Peterson

explained that he was referring to a program in Kentucky where, if a defendant completes probation

successfully, his sentence would be vacated.  See Tr. at 55:9-13 (Defendant).  S. Peterson's counsel

stated that there are two programs akin to a "diversion" in New Mexico.  Tr. at 55:18-19

(Blackburn).  S. Peterson's counsel explained that one program allows a drug offender who admits

guilt to go through a program, which if completed, would not result in a conviction.  See Tr. at

55:19-24 (Blackburn).  S. Peterson's counsel asserted that there is a similar program for Driving-

Under-the-Influence offenders.  See Tr. at 56:4-7 (Blackburn).  S. Peterson's counsel admitted that

there is no diversion program in federal court.  See Tr. at 56:6-7 (Blackburn).

The Court then asked S. Peterson's counsel about an experience the Court had with a federal

judge from Kentucky.  See Tr. at 56:12-13 (Court).  The Court stated that it had met a judge from

Kentucky who said that, because of the Department of Justice's guidelines, marijuana growers in Kentucky will grow just enough to keep their offense as a state crime, so that they are prosecuted in state court.  See Tr. at 56:12-17 (Court).  This judge related to the Court that he would like to "come out here and go to Las Cruces or something like that" because he was out of work in Kentucky, because the United States Attorney's Office did not bring many marijuana cases.  Tr. at 56:17-19 (Court).  The Court stated that it does not understand why S. Peterson would want to pick up marijuana in Arizona and fly it into Kentucky.  See Tr. at 56:25-57:5 (Court).  S. Peterson asserted that the only reason to transport the marijuana to Kentucky is because that is where he lived, and that he could not comment on the marijuana situation in Kentucky.  See Tr. at 57:6-10 (Blackburn).

S. Peterson also pointed out that in New Mexico state court, a first-time offender has the possibility of receiving a "conditional discharge."  Tr. at 57:19 (Blackburn).  S. Peterson explained that the conditional discharge in New Mexico allows a first-time offender to plead guilty, complete probation, and thereby avoid a judgment and conviction for his or her first offense.  See Tr. at 57:25-58:6 (Blackburn).  S. Peterson stated that first-time offenders who have received a conditional discharge can truthfully say that they do not have a felony on their record.  See Tr. at 58:6-9 (Blackburn).

Regarding the Court's inquiry into the marijuana situation in Kentucky, the United States posited that, because S. Peterson was caught two years ago, "perhaps the growth of the marijuana industry in [Kentucky] has taken place [since] then."  Tr. at 60:3-9 (Ganjei).  The United States also posited that the Defendants likely purchased Mexican marijuana, "probably the [cheapest] you'll find on the face of the [earth,]" and flew it back to Kentucky from Tucson.  Tr. at 60:9-17 (Ganjei).  The United States posited that, because S. Peterson is from Kentucky, he may have access to a

distribution network there through which he can move the marijuana.  See Tr. at 60:18-23 (Ganjei).

The United States stated that its argument regarding a variance was the same argument it put forth

regarding a departure.  See Tr. at 61:25-61:1 (Ganjei).

## LAW REGARDING MITIGATING ROLE ADJUSTMENTS

U.S.G. § 3B 1.2 authorizes courts to reduce a defendant's offense level if the defendant

was a minimal or minor participant in an offense.  See U.S.S.G. § 3B1.2; United States v. Aguilar,

No. 04-311, 2005 WL 2313585, at *3 (D.N.M. Aug. 18, 2005)(Browning, J.). U.S.S.G. § 3B1.2

provides in full:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> > (a) If the defendant was a minimal participant in any criminal activity,
> > decrease by 4 levels.
>
> > (b) If the defendant was a minor participant in any criminal activity, decrease
> > by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B 1.2.  "This section provides a range of adjustments for a defendant who plays a part

in committing the offense that makes him substantially less culpable than the average defendant."

U.S.S.G. § 3B1.2 cmt. n.3(A).  Application note 3 indicates that this guideline "provides a range of

adjustments for a defendant who plays a part in committing the offense that makes him substantially

less culpable than the average participant."  U.S.S.G. § 3B1.2 cmt. n.3(A).  Application note 3

further confirms that a court's task in determining the application of this guideline is highly

fact-based: "The determination whether to apply subsection (a) or subsection (b), or an intermediate

adjustment, involves a determination that is heavily dependent upon the facts of the particular case."

U.S.S.G. § 3B1.2 cmt. n.3(A).

In an amendment to this guideline effective on November 1, 2011, the United States

Sentencing Commission removed the following sentence from application note 4: "It is intended that the downward adjustment for a minimal participant be used infrequently." U.S. Sentencing Manual app. C, vol. III, at 406 (2011). As a reason for this change, the Sentencing Commission stated: "The Commission determined that [this sentence is] unnecessary and may have the unintended effect of discouraging courts from applying the mitigating role adjustment in otherwise appropriate circumstances." U.S. Sentencing Manual app. C, vol. III, at 406. Subsection (a) regarding minimal participants covers defendants who are plainly among the least culpable of those involved in the conduct of a group. See U.S. S.G. § 3B1.2 cmt. n.4. See also United States v. Justice, No. 09-3078, 2012 WL 394455, at *9 (D.N.M. Jan. 23, 2012)(Browning, J.). Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant. See U.S.S.G. § 3B1.2 cmt. n.4. Subsection (b) covers a defendant who "is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5.

For example, in United States v. Aguirre-Garcia, No. CR 08-0823 JB, 2009 WL 5851092, (D.N.M. Dec. 15, 2009)(Browning, J.), the Court found that a defendant was not entitled to a mitigating role adjustment, because the defendant, with two co-defendants, knowingly transported cocaine out of state on two occasions. See 2009 WL 5851092, at **1-3. Because the Aguirre-Garcia had the same knowledge and took the same actions as his co-defendants, in driving a car which the defendants knew contained cocaine out of state, the Court found that Aguirre-Garcia was not entitled to a mitigated role adjustment, even though Aguirre-Garcia had purportedly informed his co-defendants that he did not want to transport drugs and was only along for the ride. See 2009 WL 5851092, at **1-3. On the other hand, where a defendant charged for conspiring to distribute methamphetamine possessed only seven grams out of the 400 grams involved in the conspiracy, and

no other evidence supported the defendant being more than a "user," the Court granted a minor role

adjustment because a preponderance of the evidence did not support that the defendant was a

"dealer," as were his co-defendants in the conspiracy.  United States v. Justice, No. CR 09-3078 JB,

2012 WL 394455, at **1-5, 9-10 (D.N.M. Jan. 23, 2012)(Browning, J.).

## LAW REGARDING DOWNWARD DEPARTURES

The guidelines "place essentially no limit on the number of potential factors that may warrant

a departure."  Koon v. United States, 518 U.S. 81, 106 (1996).  See United States v. Coleman, 188

F.3d 354, 358 (6th Cir.1999)(en banc)(stating that there are a "potentially infinite number of factors

which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on

the information concerning the background, character, and conduct of a person convicted of an

offense which a court of the United States may receive and consider for the purpose of imposing an

appropriate sentence").  A departure is warranted if the case is "unusual enough for it to fall outside

the heartland of cases in the Guideline."  Koon v. United States, 518 U.S. at 92.  Accord United

States v. Lewellen, No. 11-1524, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing
> judge to consider every convicted person as an individual and every case as a unique
> study in the human failings that sometimes mitigate, sometimes magnify, the crime
> and the punishment to ensue. We do not understand it to have been the congressional
> purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, No. CR 10-2563, 2012 WL 2574807 (D.N.M. June 22,

2012)(Browning, J.), the Court did not grant a defendant request for a downward departure under

U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category over-represented

the seriousness of his criminal history and the likelihood that he would commit other crimes.  See

2012 WL 2574807, at *25.  The Court noted that Jim's criminal history included: (i) two DWI

-44-

convictions; (ii) a conviction for Roadway Laned Traffic; and (iii) Abandonment or Abuse of a Child.  See 2012 WL 2574807, at *25.  The Court found that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time the assaulted the victim.  See 2012 WL 2574807, at **3, 25.  The Court noted that it "does not take much for a defendant to qualify for a criminal history category of II," and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3.  2012 WL 2574807, at *25.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G § 5H1.11, for a downward departure based upon the defendant's eleven years of military service.  See 2011 WL 831279, at *3.  Even though Jager had received exemplary reviews in his performance reports, earning either the highest or second highest ratings possible, during his military career, the Court found that his service was not present in an unusual degree or distinguishable from other cases covered by the guidelines.  The Court noted that in many child pornography cases, such as Jager's, the defendant leads an exemplary and life publicly, while engaging in a secret life privately.  Jager's case was thus not distinguishable from other defendants sentenced under the guidelines.  Additionally, because Jager was not in intense combat during his military career, most of his time was spent in the support role of a mechanic.  The Court found, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure.  See 2011 WL

-45-

831279, at **10-11.

## RELEVANT LAW REGARDING VARIANCES FROM THE SENTENCING GUIDELINES

After United States v. Booker, 543 U.S. 220 (2005), the sentencing guideline ranges are now

advisory[10] and are one of several factors set out in 18 U.S.C. § 3553(a).  Although appellate courts

are allowed to assume that within-guidelines sentences are reasonable, subject to rebuttal, see Gall

v. United States, 552 U.S. at 50-51, the Supreme Court of the United States has made it clear that

no presumption of reasonableness attaches at the district court level to the sentence the Guidelines

suggest, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not

presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. 338, 351

(2007)("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy

the benefit of a legal presumption that the Guidelines sentence should apply.").

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than

necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

---

[10]Attorneys and courts often say that the "guidelines" are advisory, but it appears more appropriate to say that the guideline ranges are advisory.  See Gall v. United States, 522 U.S. 34, 46 (1997)("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir.2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines[.]"), and must accurately calculate the guideline range, see 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated guideline range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir.2005) ("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range[.]").  Accord United States v. Chavez-Rodarte, No. CR 0-8-2499, 2010 WL 3075285, at ** 2-3 (D.N.M. July 16, 2010)(Browning, J.).

-46-

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).  Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the Sentencing Guidelines and policy statements that the Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

In Kimbrough v. United States, 552 U.S. 85 (2007), the Supreme Court stated that, in the ordinary case, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  552 U.S. at 89.  The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case."  552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States so as to be able to provide for his two children and two siblings is not materially differentiated from other re-entry cases, and thus, no variance from the guidelines sentence was warranted.  See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other hand, in United States v. Jager, although Jager's military service was not present to an unusual degree and thus did not warrant a departure, the Court found that a variance was appropriate, because Jager's military service was "superior and uniformly outstanding," as Jager appeared to have been "trustworthy[] and dedicated, and he served with

distinction." 2011 WL 831279, at *14.

## ANALYSIS

The Court accepts the Plea Agreement. The Court carefully considered the PSR and the Court adopts the PSR, with the changes discussed at the hearing, as its own. The Court also considered the Sentencing Guidelines in sentencing S. Peterson. The Court considered the factors set forth in 18 U.S.C. § 3553(a)(1)-(7), including the finding that S. Peterson is a career offender. With an offense level of 31 and criminal history category is VI, S. Peterson's guidelines imprisonment range is 188 to 235 months, for the offense of possession with intent to distribute 193.2 kilograms of marijuana.

The Court considered the guidelines in arriving at the sentence, but also took into account other sentencing goals. The Court specifically considered the guidelines sentencing range, established by the applicable category of offense committed by the applicable category of defendant. After careful consideration of the arguments of counsel, both in their briefs and at the sentencing hearing, the Court concludes that the punishment set forth in the guidelines is not appropriate for S. Peterson's offense. The Court also considered the kinds of sentences and ranges established by the guidelines, and determines that a variance is appropriate in this case.

## I.   THE COURT WILL NOT DEPART DOWNWARDLY IN PETERSON'S SENTENCE.

S. Peterson's requests for a downward departure on various grounds are denied. While the guidelines authorize a departure for some of these grounds, the Court is having trouble squaring these grounds with the high standards for a departure. While his military service is commendable, it is not extraordinary. While he had a rough, fatherless upbringing, he seems to have largely moved beyond that phase of his life, and his upbringing is not extraordinarily different from that of many

others in federal court.  Unfortunately, our prisons contain many who have had sad childhoods.  The

Court is having trouble distinguishing S. Peterson from many others that come before the Court.

The Court believes that, with a career offender enhancement, it is best to alleviate the over-

representation issue, if any, through a variance rather than a downward departure.[11]  While Nolf may

well receive a lesser sentence and Peterson's role was slightly mitigated as compared to Nolf's role,

the difference between the two is not so extenuating as to justify a departure.  Finally, while his post-

arrest rehabilitation is encouraging, it is not so exceptional as to warrant a departure.  "Post-offense

rehabilitation must be exceptional before the Court concludes that a departure on the basis of

post-offense rehabilitation is appropriate."  United States v. Francisco, No. CR 11-0189 JB, 2012

WL 3150319, at *12 (D.N.M. July 31, 2012)(Browning, J.).  In sum, S. Peterson's case looks like

---

[11]Although S. Peterson argued at the hearing that in the Fifth Circuit, the United States would have been precluded from attaching the career offender enhancement to his sentence, this authority is persuasive only, and S. Peterson admitted that the Tenth Circuit's precedent is not aligned with the Fifth Circuit on the issue.  See Tr. at 34:19-35:3 (Linnenburger); id. at 35:6-36:1 (Linnenburger)(explaining that, under United States v. Roberts, 624 F.3d at 245, the United States would have been precluded from arguing for the career offender enhancement after S. Peterson signed a plea agreement stipulating to a lower base offense level, because the Fifth Circuit holds that the enhancement applies a new base offense level, and is not an adjustment to the base offense level, but also admitting that the Tenth Circuit "considers the career offender guidelines to be an adjustment rather than[] submitting a whole new base offense level"); United States v. Jepperson, 333 F.3d at 1183-84 (the Tenth Circuit holding that the career offender guideline is an adjustment to the base offense level, and is applied after all other adjustments to the base offense level, except for reductions for acceptance of responsibility).  S. Peterson does not challenge that his criminal history qualifies him for the career offender enhancement, nor does he allege that the United States is violating his Plea Agreement by arguing for the enhancement.  See Tr. at 39:3-40:22 (Linnenburger)(admitting S. Peterson is not trying to minimize his criminal history, and that "technically the career offender provision would apply," but asking the Court to depart or vary because S. Peterson alleges that the enhancement over-represents his criminal history); id. at 35:6-21, 36:2-5 (Linnenburger, Court)(the Court asked S. Peterson if his position is that the United States violated the Plea Agreement, and S. Peterson stated that his position is not that the United States has violated the Plea Agreement, but only that he has pointed out the Fifth Circuit's precedent "for the record," in his support of his argument for a variance or a departure because the career offender enhancement over-represents his criminal history).

many other before the federal court. The case remains confidently within the heartland of federal cases. In any case, the Court chooses not to depart, because it does not believe that departure is warranted with the facts and circumstances here. Even though a departure is authorized, it is not warranted, and the Court exercises its discretion not to depart, because the case remains in the heartland of federal cases.

## II.   THE COURT WILL GRANT S. PETERSON A VARIANCE.

Three factors support the Court's variance here. First of all, the Court finds that the career offender enhancement substantially overstates S. Peterson's criminal history. S. Peterson's criminal history does not contain violent crimes, but only marijuana cultivation and trafficking offenses, consistent with S. Peterson's current offense. While the Court believes that S. Peterson is more than a courier, he is similar to a courier, and a courier who brings drugs in from Mexico would receive a sentence of likely a year and day; S. Peterson is facing, at the low end of the guidelines, 188 months. The Court believes this sentence overstates S. Peterson's criminal history.

Second, the Court also believes that the career offender enhancement overstates and over-represents his likely future criminal activity. Although S. Peterson was not offered a diversion program, his previous sentences were probated, and he has never served any time in prison, much less federal prison, for any of his activity. Nor has S. Peterson had any probation violations. These factors encourage the Court that, with the time that he has already served, which is considerable, and the additional time that he will serve as part of this sentence today, a sentence with a variance will be a serious wake up call for him to get out of the drug trafficking business.

Third, the Court believes that S. Peterson's background counsels in favor of a variance. S. Peterson's military service, to a smaller extent, shows that he is likely to be rehabilitated. S. Peterson's difficult family up-bringing and his rough life, including the injuries he sustained before

enlisting, demonstrate a lack of youthful guidance.  S. Peterson has done relatively well and developed some good character, despite the difficulties he experienced as a child, and could have continued to do well had he been able to remain in the military.  These factors show that S. Peterson will be able to be rehabilitated, so that incarceration need not be emphasized in his sentence.

The Court has carefully considered S. Peterson's suggestion that he receive a sentence close to the mandatory minimum, between 63 to 78 months.  S. Peterson's guidelines sentence is substantially above the mandatory minimum given the circumstances of this case and S. Peterson's prior criminal history.  S. Peterson could have received an enhancement under 18 U.S.C. § 851, which would make his sentence closer to 360 months to life.

The Court does not believe that either of the parties' proposed sentences are appropriate. The Court must fashion a sentence that reflects Congress' desire to impose career offender enhancements for people who fall into that defined category, and there is no doubt that S. Peterson falls into that category.  While under certain circumstances and with a certain criminal history a defendant may argue that receiving a diversion would change that defendant's guidelines sentence, S. Peterson squarely fits into the career offender enhancement.  The Court's role is not to cut S. Peterson's sentence as much as he requests, given that society in general thinks that career offenders should have their sentences enhanced.  Nor do the circumstances of S. Peterson's case warrant cutting his sentence as much as he requests.

The Court, thus, believes that an offense level of 25 and a criminal history category of II is too much of a variance for S. Peterson.  The Court does not, on the other hand, believe that there is any reason to impose a sentence beyond the guidelines sentence of 188 months, and the Court will, thus, use that sentence as a baseline.  S. Peterson suggested that his base offense level could be 25, and his criminal history category could remain at VI, which would give him a guidelines range of

110 to 137 months.  On the other hand, a criminal history category of II without the career offender enhancement, and an offense level of 31, would put his sentence in the range of 121 to 151 months. The Court believes that a range between 110 to 121 months, which would reflect the career offender provision without increasing both S. Peterson's offense level and criminal history category, is a useful range.

While a downward departure is not warranted, the Court believes that a variance is appropriate.  Were S. Peterson's base offense level 31, and his criminal history category II, his guidelines range would be 121 to 151 months.  Also, if S. Peterson's base offense level were 28 and his criminal history category II, his guidelines range would be 87 to 108 months.  All of these different possibilities, thus, provide for a sentence between 108 to 120 months.

The Court will use a base offense level of 28, and criminal history category of IV, so as to both reflect Congress' desire that there be a career offender enhancement and that the enhancement in this case overstates S. Peterson's criminal history.  The Court will sentence S. Peterson, at the low range of the guidelines, to 110 months.  The Court believes that this sentence reflects the seriousness of S. Peterson's offense, and promotes adequate respect for the law.  Such a sentence is a more just punishment than that which the career offender enhancement provides.  Given that S. Peterson has served no previous prison time, the Court believes that this sentence will afford adequate deterrence on both the specific and general level.  Further, S. Peterson has no criminal history of violence, but only drug trafficking, and thus this sentence will protect the public.

The career offender enhancement would nearly triple S. Peterson's sentence.  A variance will avoid disparity amongst defendants with similar records who have been found guilty of similar conduct.  It is unusual for the career offender enhancement to cause a defendant's criminal history category to increase from II to VI.  The Court believes that the increase that the guidelines provide

in this case is an unwarranted sentencing disparity within similarly situated defendants who have been found guilty of similar offenses and have similar criminal histories. Further, because of some conditions the Court will impose on supervised release, S. Peterson will be provided with some needed education, training, and care, so that he may avoid his problems with drugs. S. Peterson has responded well to post-offense rehabilitation, which is a good sign. While S. Peterson's good record of rehabilitation is not a factor that counsels alone for a variance, his successful rehabilitative efforts, as well as his military service and juvenile history free of altercations with the law, despite a rough upbringing, evince some good personal characteristics. S. Peterson's rehabilitative efforts suggest that he will perform well on supervised release.

The Court thus finds that each of the factors set forth in 18 U.S.C. § 3553(a) support the Court's sentence. The Court's task is not to come up with a reasonable sentence, but rather to come up with a sentence that accurately reflects the factors set forth in 18 U.S.C. § 3553(a). See United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir.2007)("[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." (citation omitted)). A sentence of 110 months is not only a reasonable sentence and a more reasonable sentence than the guidelines sentence, but it also reflects the factors set forth in 18 U.S.C. § 3553(a). While the Court believes that it should not undercut the entire career offender enhancement, the Court concludes that it should mitigate somewhat its full impact. This sentence is sufficient without being greater than necessary to comply with the purposes of punishment set forth in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.).

As to Count 1 and Count 2 of the Indictment, S. Peterson is committed to the custody of the Bureau of Prisons for a term of 110 months. These terms will run concurrently. The Court

-53-

recommends that S. Peterson participate in the Bureau of Prison's 500-hour drug and alcohol treatment program.  S. Peterson is placed on supervised release for a term of five years, as to each Count, and these terms will run concurrently.  S. Peterson must comply with the standard conditions, as well as certain mandatory conditions and special conditions of supervised release.  S. Peterson is not fined, based upon his lack of financial resources.  S. Peterson is ordered to pay a special assessment of $100.00 for each Count of conviction, totaling $200.00, which is due immediately.

**IT IS ORDERED** that Defendant Sean Joseph Peterson's requests set forth in the Sealed Objections to the Presentence Report and Motion for Downward Departure, filed Mar. 30, 2012 (Doc. 138), and Sentencing Memorandum and Request for Downward Variance, filed Mar. 30, 2012 (Doc. 139), are granted in part and denied in part.  The Court makes certain changes, which S. Peterson requests, to the Presentence Investigative Report.  The Court denies the request for a downward departure.  The Court grants the request for a variance, but not as great a variance as S. Peterson requests.  S. Peterson is committed to the custody of the Bureau of Prisons for a term of 110 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
James R.W. Braum
Nicholas Jon Ganjei
  Assistant United States Attorneys
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Billy R. Blackburn
Paul Linnenburger
Albuquerque, New Mexico

*Attorneys for Defendant Sean Joseph Peterson*